If I could proceed, I'd like to present a couple of facts. Mr. Stewart was a small businessman for a number of years making gun kits that he advertised nationally in gun publications. And these were target shooting 50 caliber rifles. And he didn't sell them as a gun. He sold them as a gun kit, wherein part of it needed to be rifled or the receiver needed to be changed and rifled in order to make it into a weapon where the bullet was put into the barrel. Without that part of it, it's not a firearm because it's not defined because it cannot expel a projectile. It happened one day that one of his weapons was being machined in a machine shop across town. And there was an agent in there who said, you know, I really think that's readily convertible under the statute, and it just might be a violation. So he went over and bought one for Mr. Stewart, one of his agents did, and went and sent it back to Washington and said, yes, can this be readily converted? And the agent back there in the laboratory converted it into in about 30 minutes, at least, until it would expel a blank, at least. Although it was not fully adjusted. And they sent it back to Phoenix and obtained a search warrant and went into Mr. Stewart's property and found quite a bit more than just 50 caliber weapon kits. They found machine guns. They found 26 rifles and pistols. And they found quite a variety of things. What's unique about the case in one respect is that the government never pursued the 50 caliber kits being, in fact, firearms. They simply dropped that issue when they found, I guess, the gold road of all of the other weapons. At that time, I was appointed to represent Mr. Stewart initially. And upon his release, he did, upon his release by the magistrate prior to trial, he did retain a private counsel who argued the search warrant issue. And the essential search warrant issue was whether or not they could have a hearing under Franks v. Delaware. They challenged the search warrant on the premise that the statute was vague, that what readily converted means is too arguable to issue a search warrant over under 18 U.S. Code 921A3. They contended that the false and misleading information set forth in the search warrant affidavit and that the tools needed to readily convert this weapon and the time taken were not factually correct and that there were material omissions from the affidavit and search warrant. Namely, that whether you can assemble the weapon as a weapon or whether you can completely assemble it was a point of argument. And the defense asked for a hearing in order to develop that issue by cross-examination of the agents, as well as perhaps presenting other testimony from their own experts of which Mr. Stewart is certainly probably one. Well, Franks hearings usually test veracity. Franks hearings usually test veracity. And usually when challenging veracity, you're not saying that agents lied here. You're saying that they didn't say quite enough. And that, frankly, is a question of law, whether they said enough to establish probable cause. Well, one could possibly misrepresent by omission as well. And this is what the defense wished to present at that hearing, was that there were a lot more facts that the magistrate should have known prior to issuing a warrant, based upon the fact that these were long-sold gun kits advertised in national publications for many years, without ever having been molested by any agents of the government. What does that have to do with it? Well, it would have had to do with it that they could have developed that on the Franks hearing and possibly had some success at it, or perhaps no success at it. At least they would have had that hearing and we wouldn't have had this issue. All right, but let's say this was a hearing. What good would it have done you? Let's say they had, in fact, presented this evidence. Why is this evidence that should have been presented to the magistrate? I don't quite understand the question. Well, the point of a Franks hearing is to say, look, there's evidence that was either presented untruthfully to the magistrate or that was omitted. And if only the magistrate had been given truthful or complete information, this would have made a difference. The warrant should not have or would not have issued. I guess I don't understand how showing that these gun kits had been sold for years are molested. What bearing that would have? Well, because to be readily converted to a weapon would have taken a lot more tools and a lot more time than were represented and did take a lot more tools and a lot more time. There was evidence that they were able to convert them in 30 minutes. Now, you can contest that evidence. You can cross-examine it. But I don't see how, for purposes of establishing probable cause, what good a Franks hearing I mean, Charlie might be able to do something with that, but what possible good would a Franks hearing do? Because the defense would have brought out that it took more tools and more time to convert that kit into a rifle. And therefore, the magistrate should have known those facts. And had he known those facts, the magistrate may have concluded that this was not a certain warrant issue. So you're not claiming that the agent who said he converted it in 30 minutes lied? In order to have an operable weapon, it takes much more than 30 minutes, because after working on the receiver, from the machinist's point of view, the weapon has to be, the head space has to be adjusted, and other procedures have to be done in order to finish it. And the only projectile... The gold filigree on the button. That's correct. And the only projectile that they tested it with was a blank. Usually, if you can show the blank, you can show the slide. Yes, that was the contention. I've never seen an exception. That was the contention. And had they had that hearing, they may have been able to present that information and been successful at it, or that issue would not be here with us today. It's down to 2 minutes and 44 seconds. There are a couple of other issues. Anything else? Yes, a couple of other issues that need to be presented on the firearms. The second issue on appeal is the firearms. These machine guns never traveled in interstate commerce. They were basically made in this machinist's garage. And the case decided in at least my reply brief and by the government, U.S. v. Rambo, distinctly says you cannot have unlawful possession without unlawful transfer. There was no transfer of these weapons. They were made in the garage. Out of what? And never left. Out of what? Yes. Out of metal. Out of gun. Out of steel that he had available. And... Was it raw steel? I don't know that he made it out of raw steel. For instance, in some parts of it, the handle grip was purchased as a gross of handle grips that were also used on the .50 caliber weapon. He used the same one to make the machine gun. And purchased a barrel from a supply house and put the barrel on it. But the machine part of it, the receiver part, that is the machine gun, was actually manufactured by this individual. Out of what? A block of metal? About at least a partially completed receiver. I thought this was standards that were imported from Canada or something. They're not imported. Do you think they're not imported? Actually, the machine gun part of it were actually made by him and there was never any other contention by the government or anyone that they were traveled in interstate commerce in any fashion as a machine gun. The third issue that... But doesn't Rambo stand for the proposition that the transfer itself is commerce without proof of interstate commerce? But there was no transfer. But there was in the one that he sold to the agent. He didn't sell a machine gun to the agent. He sold... Okay, so that gets back to the ultimate question. Was it a machine gun? No, it wasn't a machine gun. He sold the agent a .50 caliber rifle kit. Oh, the rifle kit. Sorry. Machine guns were found as a result of search warrants. They were never displayed or advertised and so forth as far as we know. And in Rambo... That is correct. That's what that shows. That is correct. And that's where we go to the interstate commerce issue. Now, some of that stuff must have traveled. The barrel must have traveled from interstate commerce. I don't think there's any contention that some of the parts may have traveled in interstate commerce. He bought them from an outfit in Carolina in bulk. Triggers in bulk. Stocks in bulk. Barrels from Germany. No doubt about that, that the machine gun part that allows it to repeat with only one function of the trigger was actually machined by the defendant. The last issue that I wanted to bring up was... And all those sales and purchases, the purchase and sale of barrels and the triggers and the grips, are all legal? Yes. As the record shows? Yes. They're bought from a wholesale house around the country, one of them in South Carolina, a very large one. And he advertised in a publication called Shotgun News, which is basically a national publication that is almost entirely advertising. I'll save any time for people. Thank you. Okay, we'll hear from the government. May it please the Court. My name is Fred Batista. I'm an Assistant United States Attorney for the U.S. Attorney's Office in the District of Arizona, with the Phoenix Division. With respect to the issue of the search warrant, it's the government's position that the defendant has waived any issues with respect to the search warrant because of the fact that the defendant did not brief the issue in its brief. The Court has presented several questions to the defendant with respect to what would have happened had there been a Franks hearing in this case. It's the government's position that a Franks hearing wasn't necessary. To elaborate on the fact a little bit in this case, the defendant was under investigation for selling kits that were full-action, single-fire, 50-caliber rifles. And before the execution of the search warrant, that was all the defendant was under investigation for. At that time, the defendant had a prior federal felony conviction for possession of 10 machine guns from the District in Utah. The case agent bought one of the kits. He sent it off for examination. The firearms expert that assembled the weapon made a determination that it took him 35 minutes to assemble the receiver of the gun. The receiver, Your Honors, in this case basically imagined a piece of what would look very similar to automobile exhaust tubing, a higher grade, but literally just straight metal pipe with several cutouts in it. The defendant was selling it with the cutouts partially made out. You could see the cutouts in the receiver. All you'd have to do is either with hand tools, a dremel tool, or with machine equipment, finish the cutouts, and you would have a firearm receiver. One of the things that the defendant does not highlight and avoids is the issue that under the definition of firearms in section Title 18, Section 921, the definition includes the receiver of a firearm. A receiver in and of itself is a firearm. So once that, under the federal law, once that receiver is milled out and there was testimony that it took approximately 35 minutes to mill out the receiver, you have a firearm. Issues about whether or not it needs to be assembled or how long it takes to be assembled or how accurate it is once it's assembled are, in a sense, irrelevant. It's a firearm because it can propel a projectile? No, Your Honor. If you look under Section 921A, there's a definition of a firearm, and included in the definition is a separate definition is the receiver of a firearm. In other words, for purposes of the definition versus the federal law, once you have a completed receiver, you have a firearm. You need not go any farther. So in a sense, if this defendant had no other parts except this .50 caliber rifle receiver, if he was making those and shipping them interstate and engaged in a regular course of business of doing that, he would be in violation of federal law for engaging in the business of dealing in firearms without a license, even though he never sold any other parts. So the thing that he actually sold was not the receiver without the milling. It needed 30 minutes, 35 minutes, Your Honor, of additional milling. The question then became whether that was so minimal. Would this item be something that could be readily converted? Now, the defendant in the district court below discussed the second-circuit opinion, Moslow, which in that case there were small-caliber starter pistols which were converted in 12 minutes. And the defendant seeks to, in a sense, make 12 minutes as a benchmark of, well, if it takes longer than 12 minutes, it's not really convertible. But what we're talking about here is .50 caliber long-range rifles versus starter pistols. So in a sense, the court had all the information before to make a finding that, the magistrate had all the information before to make a finding that it took approximately 35 minutes to make a firearm. The only thing that the agent did not mention in his affidavit was the fact that once the receiver was complete, it took an additional 30 minutes to assemble the complete firearm and make it functional. The question of whether this was close enough to a receiver to have it be a receiver, who makes that decision and by what standards? I mean, let's say I look at it and say, well, 35 minutes of machining sounds to me like a lot. You know, you have to use one of those dangerous dremel tools. It's beyond my ability to do that. So that to me sounds like it's very far from it. Let's say that's how I think. What happens then? I think, Your Honor, what we have in the firearms area, it's kind of you have to look really on a case-by-case basis. I'm asking a different question. The reason they got a warrant is it persuaded a magistrate judge that this was illegal. And they were illegal because they were essentially receivers. They were readily convertible. And let's say I just look at it and I say, gee, I don't think the magistrate judge really got it right. I think this is not readily receivable. I think it's this. I'm sorry. It's not readily convertible. I think it's convertible and used difficultly. What happens then? Well, I think, Your Honor, if the court were to do that, I think the fallback, the ultimate fallback would be the good faith exception. In other words, all the information was presented. But I think you've skipped something. That would then defeat the probable cause. And then the question is the warrant is gone and we have to fall back on... Obviously, Your Honor, if the magistrate were to make a determination that the firearms were not readily convertible based upon the information contained in the affidavit, there would be no probable cause. But in this case, included in the affidavit were the defendant's own statements that the weapon was 75% complete, that it was foolproof to assemble. 75% of what? You know, 75% of lifting a ton is still 25%. It's still more than I can lift. So saying it's 75% complete doesn't tell you anything at all because you don't know what the 100% amounts to and what is involved in the remaining 25%. But that statement was not made in isolation. There was also information that the defendant said it was foolproof to assemble, that it can only be assembled one way, that you could do it yourself, that his own advertisement said assembly within 30 minutes. So it was not... We have a situation here, Your Honor, when the defendant is marketing the gun. When he wants to get your money, it's easy to assemble, no problem, anybody can do it. What is the law? The law prohibits the sale of a seal, is that right? Correct, Your Honor. And whether this part that says readily convertible is in the statute? It's in the same definition, Your Honor, the definition of a firearm in section 186921. Do we have any case law interpreting what readily convertible means? Well, Your Honor, there's a dearth of case law. There's not a lot of cases with respect to what in this type of area would be readily convertible. Again, the one case that the defendant did cite is the Moscow case from the Second Circuit, and that was a situation where... It's a little vague for a criminal law statute, isn't it? I realize that this is so vague. You're not here because the guy didn't get... You didn't decide not to go forward in time for that, but it's a little vague for a criminal statute if you ever try to really... You know, what is readily convertible? One guy's readily convertible, so the other guy's not there. And part of the problem is, Your Honor, is the unique nature of firearms in that you can't... I'm sorry? One of the issues that we're dealing with, Your Honor, is the unique nature of firearms. In other words, there isn't really one size fits all. You can't say, well, you've got to be able to build this gun within 15 minutes or you can only build it with vice grips and a file, but if you have to use a saw or a drill press, it's not readily convertible. Firearms are so... There's such a vast difference among firearms in terms of... I mean, you can build a firearm, a pen gun. You could build it in perhaps 15 minutes just going out into somebody's garage, and you can build a gun. Or if you're building a long-range .50 caliber rifle, that's going to take much work. So much work. So what are we talking about? Readily convertible to build a one-shot pen gun that has a spring that you get from a big pen or a .50 caliber rifle? I think... I would think readily convertible means the same thing, regardless of how complicated the ultimate piece of equipment is. It's easy to convert. Well, and I think easy should be easy for a simple piece of equipment, and easy should be easy for a more complicated piece of equipment, too. Well, Your Honor, in this case, what this firearm was... I don't know what bearing that has on the easy. Well, let's look at the facts of this case. What you have is a... May I continue? Yes, Your Honor. Okay. Once you get... Your Honor, so you have a receiver tube. And you'll have something... This is your tube, and you'll have something that has to be cut out in order for the bolt to function. And what happens is, is this outline... So let's sample. This outline is fully lined out in the receiver tube. But what happens is, is part of the metal is left in like this. So, in other words, everything is done. All the parts are there. You don't need any... There's no instructions or anything, as Mr. Stewart tells them. All you've got to do is you've got to take a Dremel tool or a file or machine equipment and just follow the line and just take that metal out, and that's all you've got to do. And if you want to sit there with a hand file and do it, you'll have a .50 caliber rifle. If you want to get a Dremel tool from Sears, black and darker, grind that out, you've got it. If you want to go to a machinist and have it done perfectly, take it to a machinist and he'll do it for you. But that's all we're talking about, Your Honor, is that the defendant is leaving a little bit of metal in the receiver because he's trying to get around the law. And that's what he's doing. That's readily convertible. That's all it is in this case is we've got... He's leaving a little piece of metal there. Tells you just follow the lines, grind it out, and you're done. And once you do that, as he tells all his customers, it's foolproof, it's easy, anybody can do it. It only goes together one way. You just put everything together. You put a bullet in it and you fire it. And that's what was told to the magistrate. The magistrate found probable cause. They went to the defendant's house. They found five Sten machine guns and 26... No, but she didn't prosecute for that. Well, and why didn't we prosecute for that? Because then I, who prosecuted the case, didn't have to stand in front of a jury and argue back and forth what is readily convertible. Obviously, it's an issue. But why do that when you have a defendant who has a prior felony conviction for possessing Sten machine guns, has five more Sten machine guns in his garage, and he's got 26 firearms in his bedroom. I could certainly understand why you went for the other stuff, but my experience is the government charges everything it thinks it can get away with proving. You must not have failed to charge that because it's not so easy to prove before the jury. As you said, you have to sit there and explain to the jury whether it is readily or not readily convertible. What about those machine guns? Those machine guns sound to me like they haven't traveled through interstate commerce. I think you have a problem. You have a problem, don't you? I don't think I have a problem, but let me back up one step, Your Honor, and state that I've been a prosecutor for over 10 years and I've charged hundreds of gun cases, and I can honestly state on behalf of my office that we do not always charge everything that we can readily prove. But with respect to the machine guns in this case, yes, the government presented no evidence that these particular weapons, as fully assembled, had previously moved in interstate commerce. Or any subset that would have made them machine guns. Like you said, the receiver is a gun, so presumably the receiver of a machine gun is a machine gun. Correct, Your Honor. So not only have they not traveled, but any part of them that amounted to a machine gun was illegal to transport across. That's correct, Your Honor. Doesn't that go contrary to Rambo? No, Your Honor. Rambo seems to say it pretty clearly. It says you've got to have illegal... What is the language they use? In other words, there can be no unlawful possession under Section 192.0 without an unlawful transfer. And then backing up, Your Honor, I'm looking at... It does say that. I don't deny that, Your Honor. And then what I would read to the Court is... Wise, because it's in there. That's wise. I hear its answer. And backing up immediately before that, citing with approval the Fifth Circuit decision in Pert, the Court also says, by regulating the market in machine guns, including regulating intrastate machine gun possession, Congress has effectively regulated the interstate trafficking in machine guns. There is a rational basis to conclude that federal regulation of intrastate incidents of transfer and possession is essential to effective control of the interstate incidents of such traffic. Where are you reading from? Page 952, Your Honor. Well, I read you from the very top of page 952, so you said you're backing off from there. I read you the very first words on page 952. Correct. So you don't mean backing off, you mean... No, I'm sorry, Your Honor. After that, after that section, if we go then to, if we read the next, after the words that the Court just cited, the Court says, again, citing Kirkwood's approval, in effect, the ban on such possession is an attempt to... Look, you're reading the same thing again without telling me where. Okay? Okay. Next paragraph, same paragraph, so many lines down. Okay, page 952, Your Honor. The Court read the first sentence on page 952. Right. I refer the Court to the remainder of that paragraph, and then also the next paragraph, the second half of the paragraph starting off by regulating the market of machine guns. And the way the Government reads the Kirk decision is, it says that it recognizes that there are times that one may be involved with simple intrastate possession of machine guns, but that when one looks at the nature of machine guns, that it's, in this particular case, because of the nature of machine guns, it is appropriate for the Court to regulate, to reach intrastate possession of machine guns, because by eliminating or allowing, by not allowing people to possess machine guns solely intrastate, that eliminates the interstate demand for such weapons. And what we're talking about here, Your Honor, is we're talking about machine guns. We're not, again, we're not talking about slide rules. You know, I have no clue what you just said. Maybe you should try again. The sentence, I read you, it says, you can't have unlawful possession without an unlawful transfer. Okay? That's where we start. And then it seems to me the rest of the paragraph just explains this. Look, once they've been transferred, when they've crossed state lines, then you regulate them within the state, because that affects the interstate commerce, because they've already crossed state lines. But I don't see where anything that you talk about there, that talks about there, speaks to the situation where there is no transfer of state lines. They've already crossed state lines. Or how it could be in light of Lopez. Your Honor, if you look at the next paragraph, starting out by the sentence that says, by regulating the market in machine guns, including regulating intrastate machine gun possession. Was this prosecution under Q or O? 922-0, Your Honor. 922-0 is the machine gun ban. 922-Q was the handgun in the school zone. My understanding of your argument is, there is no interstate transfer required by 922-0. Correct, Your Honor. To make the crime. Correct. And so then, therefore, the question is, is whether this statute valid under Lopez. Correct. And then your argument is Rambo says, this is a valid regulation of interstate commerce, for the reasons you just said, and therefore, no interstate transfer is required. That's correct, Your Honor. I got your argument. It seems when you get back to where Judge Kaczynski is, if you read the paragraph beginning the prohibition of possession. Yes, Your Honor. It says section 922-0, on the other hand, prohibits possession of all machine guns illegally transferred. Now, it does say it regulates the possession of a weapon in a specified geographic area. But in those cases, we had a transfer. There was no question about a, in the next case, I think they had a purchase of a gun show or something like that. So you had a transfer. And I think what you're saying is, if you show possession of a prohibited weapon under 0, that's all you need to show. Yes, Your Honor. And again, but a unique prohibited weapon in that it's a machine gun. Right. Yes, Your Honor. Right. And then also, the government cited a number of cases in other circuits also along this line. The government's not aware of any case, the 922-0 case, which has allowed the simple intrastate possession of a machine gun. The courts have read the 922-0 to reach machine guns regardless of whether or not the individual weapon had moved in interstate or foreign commerce or been transferred. So that would reach his argument that since he built it himself, there was no transfer of the weapon. There was a transfer of early components. That's correct. For the court's information, the Sten gun generally, the Sten guns were manufactured by the British during World War II. They were manufactured in very large quantities. Again, the Sten gun has a very similar tube as to the tube I demonstrated to the court. Under federal law, the tube is the receiver. The tube in and of itself is a machine gun. So the parts without the tube are not subject to regulation. So these were original Sten guns or replicas? What we have, Your Honor, is the defendant was ordering Sten gun parts but not the receiver. He received the Sten gun parts interstate and then was assembling a Sten gun-like device. There was testimony presented at trial that these Sten guns were not a classic British Sten gun. What they were is it had some Sten gun parts, it had a Sten gun tube, and then it had components that the defendant was also using on his .50 caliber rifle. So some of the components on the .50 caliber rifles were the same that were on the Sten. So the defendant was modifying his Sten guns to add some of his .50 caliber rifle components. Okay, thank you. Thank you. You're out of time. You have a minute for rebuttal? No, I don't think so. Okay, the case is audience can submit it. Thank you. Next case is United States v. Espinosa. You're out of time. Good morning, Your Honors. My name is Ross Disselman. I represent the appellant in this matter. I also represented Mr. Espinosa in District Court below during the trial. The first issue I'd like to talk about concerns the Sixth Amendment right to compulsory process. We subpoenaed a witness to testify. That witness failed to show up. The judge... ... The proof was that, well, first of all, I want to make something clear to this court, which is that we followed all the proper procedures. Well, that may be, that can maybe be part of your argument. But you... What proof could we present to the District Court? That you had subpoenaed the guy you wanted. Well, first of all, I made a proffer to the court that we subpoenaed Tony Espinosa.  I'm based in Nashville, California, in Los Angeles, California. And I am an officer of the court. And I based that evidence on my investigate. We also called as a witness Brenda Leyva, who... Had not served him. No. She called him on the phone and reminded him of the continuing obligation. And it is the law of this court that once you've been served with a subpoena, that you have a continuing obligation to obey that subpoena. I expected him to... Was the return on the subpoena introduced as an exhibit? At the time of trial? No. It was submitted. It is part of the excerpt record. Right. I've looked at it in the excerpt. But my question is, was that submitted at the time of trial? It was not submitted at the time of trial. I want to direct attention to... The excerpt of record at page 92, where the court says... This is the next day after it becomes clear that the court is not going to... Get the marshals to arrest Mr. Rambla. And is also going to allow the government... Is also going to strike any testimony regarding the fact that he was subpoenaed. And the court says... We don't even know for sure if you subpoenaed the right person. If you have the actual subpoena. Mr. Vissiman, that's me. I do, Your Honor. The court. But even though he has been subpoenaed, that in and of itself... Well, I'll put it this way. You can say you subpoenaed him. The court... My understanding of what the court is saying there is that he's expecting my proffer that we actually subpoenaed him. Which to me means that we served him with a subpoena. On page 95 of the... How difficult would it have been for you to show that he had deserved a subpoena? I had it in my... You had an investigator who had already testified. Right. And you didn't ask him at that time. No, at that... Well, the investigator... I used to work... Let me give a little background. Of course. I used to work at... I used to work at... I don't know what your life history is. I'm not giving my life history. You didn't ask him at that time. You didn't ask him? No. Yeah. Right. Yeah. Okay. I did ask for a continuance, however, to call that... You're jumping ahead. At the time you testified, you didn't ask him. No. You could have. You didn't. I guess I could have. At that time, I expected the witness to show up. I didn't... I don't know why I... You want to take time agreeing with me? Yes. You want to take more minutes? No. You could have asked him. You didn't ask him. Right. Okay. Then you have the next day on the stand, you had Leyva, who said, I talked to him and I also talked to the investigator, the original investigator, and he, the original investigator, told me he serviced me and I talked to Leyva. Right? Right. Now, at that point, how difficult would it have been to put the investigator back on the stand? Very easy. He's two blocks... He works two blocks away. Why didn't you just call him at that point? Because the judge wouldn't let me. I asked at least three times. Well, you asked for a continuance, but it seems to me if you've got another witness, how long would it take for the guy to come into court? I asked... I said to the judge, do you want me to get my investigator? And he said no. He said no. I'm not... It's too late in the game for that. I have the impression that you were asking for a continuance just to put him on the stand. Well, I... Well, no. I did not ask for a continuance. I did not ask for a continuance to put him on the stand. I mean, I did say to him a couple of times, I said, should I call my investigator? And he said... And he says... I say, for example, on page 81, I say, should I call my investigator from Federal Defenders? And then the court says, I'm not saying you didn't serve him. I don't know who you served, but I think you made the point that you tried to get him. And I said, okay. Then the next day... So, to me, that means that the court is accepting my proffer that the investigator actually did serve him. Then the next day, the government springs this motion, moves to strike all the testimony that Tony Arambola, the witness, ever subpoenaed. And then I say, Your Honor, it sounds to me like the government is arguing some kind of bad faith. We asked to reopen the case so I can call my investigator who subpoenaed him. I asked to do that yesterday. We would ask to reopen the case. We can say that that person, my investigator, talked to Tony Arambola, and that is the Tony Arambola who was threatened with espionage. Did this... Did you make a proffer as to what Tony Arambola was going to testify to? I did. That's also in your executive record in my ex parte application. Tony Arambola was the man who drove down with my client on the day that he was arrested, spent time with him in Mexico. He was also the person that owned the car that my client was arrested in. And he's going to stand and say, You know, I had this car full of drugs, and Mr. Espinoza took it and drove across the border with my illegal drugs. Bad chance. I expected Mr. Arambola to get on the stand and... And confess. No. And to testify, and that once he testified, the jury... That testimony would have been helpful to my client, and the jury would have acquitted my client. I anticipated that Mr. Arambola's testimony would have helped Mr. Espinoza. I'm still confused as to... Did Mr. Arambola ever say... Was your proffer that Arambola had said to your investigator, This is what I'm... You know, This is what I know. This is what they say. Well, at the beginning of the case, I made some investigations. I made an investigation, and that was based on my investigation. It was that Mr. Arambola... Based on what my investigator told me, what my client told me, what the discovery from the government provided me, that Mr. Arambola was a critical witness in this case. I filed my ex parte applications about six months before trial. Okay. But the idea that he would actually testify, other than taking the fifth, I don't understand where you get that idea. Well, I don't subpoena people. I mean, I didn't subpoena a witness with the expectation that he would take the fifth. I subpoenaed... What else is he going to do? He would corroborate my client's story that my client's testimony that he owned the car, that he drove down with him on the day, that he was... The car that's full of drugs on that day. In the trunk. And he... Okay. All right. Wouldn't he then have been confessing to having had the drugs in the trunk? Well, this is all speculation. I mean, would he have? I don't know. I mean, I tell you what. If he was on the stand and he lied, he would be subject to cross-examination, and the jury would have... The client's going to take the fifth. Well, which is why the jury would have had an opportunity to decide the case based on the testimony that was presented to it. At this point, the jury didn't have any testimony. I'd like to also point out... Isn't the most likely thing that would have happened is he had taken the fifth? He gets on the stand and says, I'm going to talk about this. I don't think this court can speculate as to whether someone's going to take the fifth. I certainly don't think that the client's right to the Fifth Amendment compulsory process should rest on some judge's speculation that an exculpatory, critical witness will take the Fifth Amendment. I wouldn't want that either, but we're the best you've got, you know, if not judge's speculation. Who else? Because that's what we... We have the Constitution that says that you have a right to compulsory process. Well, maybe this case... Assuming that's the case, you still have to show how much prejudicial error. Well, you have to show it makes a difference. Sure. Well, I think I can do that. The most likely thing that would have happened is that the guy who got on the stand and, you know, played the Sphinx can really say that your client would have been better off with that. I'd like to point something out. I think this also addresses this court's concerns with whether he would take the fifth at all. And that is what makes this case particularly egregious, which is on page 109 of the executive record, which is the government's rebuttal argument to the jury, which was explicitly allowed by the court. Now, there has been a lot of talk about Tony. Where is Tony? We don't know where Tony is. We don't know if Tony even exists. It's pretty convenient for the defendant to take the stand and blame it all on Tony and then say, well, he didn't show up. Therefore, you can infer that Tony is the guilty one. Ladies and gentlemen, there's absolutely no evidence of Tony knowing about this and coming down here. In fact, the judge has instructed you that testimony that's been subpoenaed, that is not evidence. So the government, in its rebuttal witness, is telling the jury this guy doesn't even exist. This is a figment of the defense's imagination. If he would have showed up, even if he took the fifth, the jury would have seen that he did exist and that he wasn't a figment of our imagination. This was a witness that, by the government's rebuttal argument, became even more critical. Did Mr. Carey testify that the car was owned by a Tony Aaron Bullock? No. The registered owner of the car was actually somebody else. Okay. So he testified it wasn't your client's car. It was definitely not my client's car. Okay. So that evidence was already in that it wasn't his car. That it wasn't my client's car. Oh, that was probably in during the government's case in chief. Okay. It was not my client's car. The registered owner of the car was somebody else. Mr. Carey was one of my first witnesses. Then my client testified. Then there was a 15-minute recess during which I went out to see if Mr. Arambola was present. When he wasn't present, that's when I called Ms. Lava. By that time, Mr. Carey had already gone back to the Federal Defender Building. It was just two blocks away. There's another issue I'd like to talk about which concerns the text. In its rebuttal, the government presented evidence of a text printout. A text printout. A text stands for Treasury Enforcement Computerized System, I believe. The text printout is basically a computerized printout produced by Customs, which documents the time that cars enter and leave the United States. It does this with a license plate. The defendant, Mr. Espinoza, testified that he entered Mexico at about 7 o'clock that evening and the government in this rebuttal presented evidence that their computerized printout indicated that he actually entered. I'm sorry, I had it reversed. Mr. Espinoza testified that he entered Mexico at 2 o'clock. The government testified that the text printout indicated that he entered Mexico at 7 o'clock. Text evidence is generally admissible. I agree with that under the Orozco case. However, the Orozco case says that although this evidence is generally admissible, this computerized document is generally admissible, it still is subject to a reliability finding by the court. And there needs to be a proper foundation laid for it. In this case, the judge found that there was no proper foundation laid for this document. The judge says, I think you could have laid a better foundation, but you didn't. So I'm excluding the document from entering into evidence. The jury cannot consider this document. Or should they have done than what they did on the foundation? Well, if you look at their foundation, they really didn't do anything to lay a foundation except for just explain what that computerized printout is. For example, in Orozco, well, What do you think they should have done besides that? Well, in Orozco, the court points out that there was a verification procedure. In Orozco, there was testimony that an inspector typed in the license plate number into a computer, and then the primary inspector, for cars coming into the United States, verified that the number on the computer screen is actually the number of the car that the person meets at the booth. In this case, you're talking about outgoing cars, cars going to Mexico. There are no inspectors on those outgoing booths at the outgoing lane. There was no evidence that any inspector typed in license plate numbers when they leave into the United States. So there would need to be some foundation related to where they get these license plate numbers when you have a car that's leaving the United States into Mexico. So I think that would be critical, and it would also be necessary to double-check that information, to show a foundation for how it was verified. Your Honor, I'd like to reserve the rest of my time for rebuttal. Okay, you guys. Good morning, Your Honor. James Stasiuk of the United States in this matter. I'll address the issues as presented by the defense counsel, beginning first with the subpoena issue. The defendant is responsible for the production of his witnesses, and the court is justified in refusing to issue an arrest warrant unless the defendant adequately proves that we have actual service of process. There was no evidence of process, no evidence at trial, that service of process had actually been affected. In fact, it wasn't produced. The judge kind of signaled that he believed Mrs. Leyva, and that it wasn't necessary to prove anything else to defense counsel. I have a separate comment on that. First, I would say I'm not sure whether the court is in a position, actually, to waive the service of process requirement. I think it's actually made clear in the record that if the government had seen fit to waive that requirement, it could have done so. But that was not the case. So I would begin with that. And first, and then I would say that I think the district court may have miscommunicated in some event, or they weren't on the same page, because it did draw a distinction between actually issuing a subpoena, you know, which it had done validly on two prior occasions. There's a difference between issuing the subpoena and actually proving valid service of process. And it did say you didn't prove that. They didn't produce the service of process until sentencing, seven months after trial. And what they did do is put on the two investigators. But they did ask for time to bring the investigator in to testify that he did serve it. They had that opportunity, Your Honor. I would agree. They had two opportunities to do that. They asked for time to bring the investigator in, and the judge said no. The trial must go on. I've made somewhat odd statements as well. You know, I've seen this with the government. If the government's witness isn't here, the case goes on. But, of course, the government has the FBI and the Treasury and all sorts of agents out there. They don't need a bench warrant in order for the court to force somebody into court. They just stand a couple of agents down, and they can haul somebody into court. So I thought that analogy was really inept on the district court's part. Why in the world would the court not say, okay, if you have service of process, and this is a key witness, you've got an hour to bring the witness into court to show that half an hour, or, you know, you put on your next witness, but you have leave to make a phone call to have the witness brought into court, and the witness better be here before your defense case is up. Why isn't that the appropriate thing for the court to do when confronted with a request by a policy that my witness who's under subpoena didn't show up? If I may, Your Honor, the decision by the district court whether to reopen the case or to permit a continuance for additional evidence is well within the – it's an abuse of discretion. It's well within the court's discretion whether it should do that. And we may think that that should have been what was done, but it is an abuse of discretion standard. Here, defense had two opportunities through two different witnesses, and they testified within two witnesses of each other. Clearly, the defendant knew that service of process was going to be an issue, yet they chose not to ask the appropriate questions of the investigator who actually did the subpoena service or allegedly did the subpoena service. How did the defense know that? In other words, I take it in this trial the witnesses were probably excluded from the courtroom. So defense counsel's in the courtroom doing his job. He may not know that Tony isn't there until he goes to look for him. So why would he ask the investigator on the first trip up, did you subpoena Tony? No reason to. He doesn't know Tony isn't there. Well, he did see fit to ask the second investigator, Brenda Layla, whether she had – they asked him the subpoena questions. And the judge was – Wasn't that later? That was two witnesses later. I mean – But there wasn't that after the question of attendance of Tony had come up. If defendant was aware that service of process would be an issue as well, he did at this point. Because he asked the questions not having known whether Mr. Arambula was going to show up. He asked the same questions of the witness, the very next witness. I thought Brenda – I thought that Brenda was put on the stand after Tony's non-attendance was discovered. No. No, that's not true. She – it was after Kerry, I believe, was that examination. And they chose – you know, they asked the questions – she didn't have any idea whether he was served. It's my understanding, she said, it's, quote, my understanding that if Tony Arambula had been served, but she didn't know when he was served, how he was served, where he was served. She testified that she had simply called up a Mr. Tony Arambula and reminded him of his continuing obligation to testify. And the judge said, well, that's hearsay. We don't know who you contacted. You had your – you had the investigator who actually, allegedly, did the service of process two witnesses ago. You didn't ask him? You knew this was going to be an issue. You didn't ask him whether he actually served, when it was served? But how is she going to know it's an issue? The – until the witness is called and is not present, how does he know it's an issue? I don't understand. The judge seemed like an awfully big hurry. The first time the witness gets called, the witness is not there. They say, look, we expected the witness to be here. He is not here. We had the investigator talk to him and remind him of the need to be here. We expected him to be here. He is now not here. We want to prove up that he is on the subpoena and ask for a warrant to have him brought in. I don't understand why. And then you, you think it was appropriate for you to then argue to the jury that this person doesn't even exist, when you know pretty well that, in fact, there was a – isn't that sort of the kind of pushing past the proper and ethical that government lawyers shouldn't be doing? Whatever they were able to prove in court, I mean, you knew darn well that they had, in fact, tried to get this witness in. Your Honor, I actually wasn't the trial attorney in that matter, but – Well, who the trial attorney was. I would say that there was no improper argument on that basis. On the state of the record that then existed, there was no evidence that Tony Arambula, or I don't know how many Tony Arambulas there may have been, there was no evidence that he actually – The government is not bound simply by the state of the record. It's also bound by what it knows to be the truth. And it can't make an argument, even if something is not available on the record, that the government lawyer knows to be untrue. And for the government lawyer to stand there and argue, oh, there was not even such a person, you should have said there was no such a person, when you know darn well there was such a person, when the government lawyer knew, was there, knew there was such a person, to make the defendant out to be a liar in ways that you, the government lawyer, knew was not the case. It's the same amount of corporate conduct. I'm not sure that whether on the state of the record at that time, whether that's the case. You keep talking about the state of the record, it's fine. Did you hear what I said? I did. Okay. So why do you keep talking about the state of the record? There was no valid service of process ever issued. We don't know if, in fact, they had served A. Tony Arambula, B. Tony Arambula, with whom he had allegedly gone down to Mexico with or anything. So they're suggesting that we don't know who this guy was. We don't know if they got the right guy. I think that was the tone that he had meant to convey at the time. I don't think that is in his program. He said quite a bit more. He said, oh, there was such a guy. It was not deemed to be improper at that time. And I think that because they had not had the... Well, it never means to be improper. Did you ever read Kajan? I'm sorry? Did you ever read Kajan? You should. Of course, whoever uses them has to read Kajan. That guy stood right there. So, oh, it doesn't mean to be improper. We've told a different kind of friend. But it doesn't mean for it to be improper. Well, I would still submit that I don't believe... Perhaps we have a disagreement on that, whether it was or was not improper. I don't think it was. You know, we had a disagreement with the cynic, too. I guess we won on that one. But I don't understand. Once the witness does not show up, tell me one more time in plain English why it is not an abuse of discretion for a district judge to fail to allow a short amount of time that is needed for the defendant to bring a witness into court to prove up that the witness is a subpoena and that, therefore, the defendant is entitled to a court's assistance in bringing the witness into court. Why is the defendant, once he makes that discovery, not entitled to a very brief period of time to allow for him to present that proof? Why is it an abuse of discretion to deny that to the defendant? I will answer that. We've got to consider the context in which this question is being asked. There were two proofs of service allegedly produced in the record. They are dated August 7th and August 28th, 2001. Neither of those are the trial date in this case, which is February 5th, 2002. That's several months later. Now, given that great time span we're talking about and the significance, this Tony Arambula being the so-called critical witness, having had so much time he left, we would expect that, well, the defense counsel has been fit to issue a second subpoena for this August 28th date. Why not issue another one? Why not make darn well sure that if you knew he was the critical witness, you should have produced him? You should have asked the question of the investigator who actually did the service to confirm that, in fact, we had properly served this guy. You had two witnesses to do that. I don't understand what you're saying. I asked you a question, and you've said all sorts of things. Why is it not an abuse of discretion? Just listen to this one more time. Don't do that. If you don't answer this time, I'm not going to ask it again. Witness fails to show up. Defendant claims he can prove up with a short delay that the witness was on the subpoena. Why is it not an abuse of discretion for a district judge to fail to give a short period of time, maybe just a matter of an hour or two at the most, for the defendant to bring that witness into court to present whatever evidence may be available on the question of whether the witness was on the subpoena? I understand that. Two answers. He already had two bites. Just give me one. He had two bites at the apple. He had two witnesses to do it, and he didn't do it. We don't know that a third bite would have been sufficient, and he waited until the very last minute. Were those witnesses before the witness was called, and, I mean, after the witness was called, and failed to show up? They were both before. Okay. So, in other words, from the time that he discovers the witness is called and does not show up, okay, that's the point he discovers he has a problem, okay? Why is it not an abuse of discretion for the district court to fail to give him enough time to prove, a short amount of time to come and bring a witness in to prove that he has the witness on the subpoena, the witness has a legal obligation to come into court that was now violated? Your Honor, they had the witness in court who was already on the stand, and he could well have had, he had an ample opportunity to demonstrate that he hasn't served, but they didn't do it. Do you disagree with your opponent that he made a proffer to the district judge of proof of service by calling the investigator back to the courtroom? Did your opponent do that? I don't dispute that. All right. Now, usually, in the courts I've been in, a proffer by counsel tells the court, I'm prepared to prove this, Your Honor, so for purposes of the proceeding right here, right now, I ask you to take this as a given for purposes of what we do from here. So I'm offering to prove to you that this investigator served Mr. Arambula, and I'll get him back here if you want. And the district court never said I don't believe it, I want to see the witness. He went on from that, which to me takes it as a given that the court said, yeah, you can prove that if I allow you to, I'm just not going to let you. Now, what's wrong with that as an explanation of what was going on in the courtroom? Well, I'm not sure it actually accepted the proffer. I know that a proffer was given, but I don't know that he necessarily agreed with that. But he didn't go behind it. He didn't go behind it. My experience is unless if the lawyer gets up and tells the judge, Your Honor, I'm going to proffer proof that the son will not come up tomorrow. The judge is going to say, I think you better prove that one. But if he wants to make a proffer that I have a witness that I can produce to prove X, and the judge doesn't take him up on it, then he has accepted that proffer. He said, okay, I believe you. You have that witness. Let's go on from there. Isn't that what the court did? He went on? Right. He did. Right. And so he accepted counsel's proffer. That's what proffers do. You build on that as a fact for purposes of what you're doing. So why wasn't it abuse of discretion to accept the proffer but not give the counsel a chance to follow through? Again, I would say that he had two bites of the apple. He had two witnesses on the stand that could have proven service. He didn't do so. He asked questions of the witness who didn't serve, but he didn't ask questions of the investigator who did serve. Why not? And that's a significant issue. Why don't you have the proof of service right here? Why did it take you seven months later to actually produce the proof of service? It didn't come out until sentencing, September 5th. Can I ask you a question? Assuming that we found he made a proper showing of service, are you dead or do you have any other backup argument? Well, I mean, I think Your Honor's hit on it earlier. I'm not sure that that would have gone anywhere because, you know, I'm not controlling it. You didn't add an alternative argument to your brief. You seem to totally rely on he didn't make a showing of proper service. So, I mean, what is your actual backup argument, if you lose on that, or do you have none? I mean, I don't know that Tony would have actually taken the stand. I think he would have, you know, I'm not sure. I think he would have taken the fifth. I don't know. I mean, we're speculating there. I think it's harder for your colleague to argue when there's no such person. Yes, I would agree. Even if he takes the fifth, it certainly would have helped the defense lawyer, I guess, say, look, this corroborates my story. Here's a guy. We asked him about the car. He won't say anything about it. Why? Because, of course, he knows there's drugs in there. I mean, it's not as good as having the testifier say it's me, but it's a lot better than having nobody there and having the government say, having the court decide you can't even talk about the subpoena and having the government say, oh, the guy doesn't even exist. Is he allowed to call him if he knows he's just going to plead the fifth? I'm sorry? Is he allowed to call him if he knows he's just going to plead the fifth? I think so. I don't know. I never was briefed. You can't call a defendant, but you can call him. You can call a witness. Sure. You can call a witness. You can call him just to make him plead the fifth. Also, at least you'd know he was there. At least he'd be able to understand. Okay. So then you are relying solely on lack of a subpoena, nothing else. You have no backup argument. No. Okay. Are you going to be counsel in retrial? I'm sorry? Are you going to be counsel in retrial? Probably not. Okay. We've got three minutes and 16 seconds. I'll address briefly the text argument. There is an evidentiary ruling, again, as a review for abuse of discretion. And even if there is, this court should not reverse unless... I'm sorry. Which one is this? This is the text argument, the text document. That was a weird ruling. This guy judged me on a lot of weird rulings. He says, I don't admit it. I find it unreliable, I think he said. But then he let the agent testify about it. I don't understand how you can allow a witness to testify about something that you've just ruled is itself inadmissible. I agree that that is peculiar. It's very peculiar. Unless there is some showing that the witness perhaps had some independent recollection of the facts in that document. Well, standing out there, he's just going to build a license plate. I would agree. I mean, that seems like it's very peculiar. It's not error. But if it's error, it's harmless error. I mean, we have very strong independent evidence of guilt. The defendant was the driver and sole occupant of a vehicle containing over 350 pounds of marijuana, worth over $280,000. He was nervous at primary. And perhaps most importantly, he gave a full and detailed confession. So, I mean... Was there actually enough foundation for the text document or not? I don't think there was. I don't think there was. I mean, it was supposed to come in as a business document or an 8038. For whatever reason, trial counsel did not lay an adequate foundation. Was it made at or near the time? You know, by the person that has personal knowledge. I would agree that inadequate foundation was laid. But even if there were error, again, it's harmless error. I mean, we've got the driver, sole occupant. We've got the barbos. There's several cases that hold that knowledge can be inferred from possession of a large amount of drugs. We have nervousness at primary, which is also a telltale sign, giving indications of consciousness of guilt. And we have the detailed confession. So, apart and aside from the text document, we have tons of evidence of supporting the conviction. So, I think it was harmless error. Thank you. To build on something Judge Rastani said with respect to the subpoena, I think that the government is dead if they rely on the proof of service. The government has conceded that the error was not harmless. And they also waive it in their brief. So, they are relying solely on the fact. How do you get past the harmless error argument? Look, he confessed. He gave a full, complete confession. He was found with the drugs. He was nervous at secondary. Why does any of this other stuff matter? At primary, I'm sorry. He was nervous at primary. Right. I assume this court is saying harmless error with respect to both the text and the founder's subpoena. I think everything. Yeah. Well, first of all, with the founder's subpoena, that's a constitutional issue. So, it's a much higher standard of harmless error beyond a reasonable doubt. Like I said, the government conceded to this court that they have no argument that it would be harmless error. So, I think this court has to defer to the U.S. Attorney on that basis that it's not harmless. The reason why I don't think it's harmless for this court's comfort is you can rely on United States v. Velarde Gomez, which is an en banc decision which had the guy testify that he was the sole occupant of a drug containing a significant amount of marijuana. And the court in that case, an en banc court, said that that was not harmless error. There are confession cases tried in the Southern District of California that get which jury to quit. Not all juries believe the agents when they testify that defendants confess. And, in fact, it was controversial in this case. So, I just — Did the defendant deny the confession during his testimony? Yes. He said that the agents misunderstood him. It wasn't documented. It wasn't — There was no tape recording of the confession. It was just based on the agent's memory, basically, of what was said. His argument was, I didn't understand what they were saying to me. I don't understand English very well. And then there was all this testimony about how good his English was. Right. Right. Which wasn't much — okay. Right. I mean, it was — that was essentially what it was about. It was controversial. And I think this court can rely on — I mean, he doesn't say, I didn't say it. He says — what he says is, my English wasn't good. And then they prove that he's a jail interpreter, that his — you know, and that he speaks very good English. Yeah. Well, essentially. Essentially, that was what was offered at trial. The controversy was whether he actually confessed or not. He said, I knew that there was marijuana in the car. That was what was controversial. Again, I think that having Tony Arambola show up and say, you know, this is my car. I am a friend. I know him. Just saying pretty easy stuff. I don't know if he'd have to take the fifth on, yes, I know who this person is, yes, I exist. He doesn't need to take the fifth. He wouldn't need to take the fifth to say that. The government suggested that — I think when the government — But if you were Tony Arambola's lawyer, you would not have advised him to say, yes, that was my car. We were hanging out in TJ, you know, right before he went back, the car lay in front. I don't think these are the things that you — as Arambola's lawyers would have told him, and talk about them. I don't know. I mean, maybe Tony Arambola felt so overwhelmed by this that he would feel the need to confess. I've seen this happen once. Yes. I've seen this happen once. I mean — Guy comes to the court and says, it wasn't me, not him. And you know what happened? They arrested him right out of the courtroom. Right. And look, I — I'm Perry Mason all the time. That's what I would — right, exactly. And that's what I assumed was going to happen in this case. Look, he was a witness. I expect him to testify and to tell the truth to the jury. The court — the government argued to the court, it's inappropriate. The defense can come up with anybody named Tony, ask him to come, and then raise the inference that this is the Tony Guy who committed the crime. When it became clear to me that the court was not going to allow me to reopen my case or subpoena — or get Tony to testify, I changed my strategy. And my strategy was, he didn't show up. Blame him. Blame him and say, look, he didn't show up. He's obviously guilty. He disobeyed and disregarded a court order. I think that's perfectly permissible for me to argue. The judge said no. He said, stay away from the subpoena. The subpoena is not evidence.  I don't understand what that means. But when I tried to argue, look, we expected him to show up, the government objected, and it was sustained. I was not able to argue that he was — Tony was obviously guilty because he failed to show, yet the government was able to argue, don't believe the defense, because how do we even know Tony is guilty? You're out of time. Thank you. We're going to take a five-minute break. We need five minutes.
judges: Kozinski, Tg Nelson, Restani